ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| CHARLES W. WALKER, SR., | * | CR 104-059 |
| YOLANDA MONIQUE WALKER, | * | |
| THE CWW GROUP, INC., GEORGIA | * | |
| PERSONNEL SERVICES, INC., | * | |
| and THE AUGUSTA FOCUS, INC. | * | |

O R D E R

On the evening of Monday, May 23, 2005, the Government and Defendant Charles Walker[1] objected to each other's allegedly unconstitutional use of peremptory challenges to strike various jurors from the jury. After hearing argument from the parties on the matter, I ruled that Defendant Walker had not meet his burden of showing that the Government used any of its five strikes in an impermissible manner, but that the Government had met its burden of showing that Defendant Walker had purposely used four of his peremptory challenges to discriminate against white males in the venire. In addition to the comments that I made from the bench at that time, I write now to further explain my reasoning behind this ruling.

---

[1] As stated in the Orders of May 11 & 19, 2005, only Mr. Walker and the three corporate defendants are on trial at this time. For ease of reference, I am referring to these four defendants collectively when I refer to Defendant Walker individually herein.

## I. Background

In accordance with the Order of May 11, 2005, the jurors in this case were drawn randomly from all six divisions of the Southern District of Georgia. Prior to jury selection, the venire members completed a seven-page questionnaire which the Court had prepared with the parties' assistance.[2] At the time of roll call on the morning of May 23, 2005, about seventy potential jurors were present for jury selection.[3] Upon Defendant's prior motion (doc. no. 103) and Defendant's oral request on the morning of jury selection, individual voir dire was conducted on the thirty-three potential jurors who either indicated in their questionnaire or that morning that they had been exposed to pre-trial publicity or believed that they could not be impartial.[4]

---

[2] Counsel had access to these completed questionnaires from the time of the pre-trial conference held on May 5, 2005 up to the time of jury selection.

[3] Because of the district-wide venire, some of these potential jurors had traveled over four hours to be present at roll call.

[4] The majority of the jurors who required individual voir dire were from the Augusta Division (Burke, Columbia, Glascock, Jefferson, Lincoln, McDuffie, Richmond, Taliaferro, Warren, and Wilkes counties). Notably, the Government had moved prior to trial to exclude the Augusta Division based upon pre-trial publicity, but the defense strenuously opposed the motion.
  The Court first conducted individual voir dire of those that had indicated that they had been exposed to pre-trial publicity but had not indicated that they were in any way biased. Most of those potential jurors represented that they could render a verdict based solely upon the evidence and the law and without regard to what they may have seen or heard prior to the call of the case. Those jurors were retained in the jury pool. Before moving to the individual voir dire of potential jurors who indicated they could not be impartial, I suggested to the parties that those jurors be excused. Defendant rejected this suggestion, rendering the voir dire process more lengthy than necessary to seat an impartial

After excusing some of these potential jurors for cause, forty-seven potential jurors remained. The Court drew forty-two potential jurors at random from this remaining pool so that there would be twenty-eight potential jurors, eight potential alternate jurors, and six more "just in case." Additional individual voir dire was conducted on these forty-two potential jurors. At 6:18 p.m., I kept the twenty-eight potential jurors[5] and eight potential alternate jurors[6] in the courtroom and sent all of the extra potential jurors into the hallway.[7] After the Court afforded the parties ample time to review their notes from voir dire, Defendant exercised all of his twelve peremptory challenges and the Government used six of its eight strikes so that twelve jurors[8] and four alternate jurors[9] remained.[10]

---

jury.

[5] The race and gender of these twenty-eight potential jurors is as follows: twelve white males, six white females, one black male, eight black females, and one Indian male.

[6] The race and gender of these eight potential alternate jurors is as follows: four white males, two white females, and two black females.

[7] At 7:07 p.m., the parties consented to the dismissal of these extra potential jurors that remained in the hallway.

[8] The race and gender of these original twelve jurors is as follows: two white males, five white females, one black male, and four black females.

[9] The race and gender of these four alternate jurors is as follows: two white males and two white females.

[10] Pursuant to Rule 24 of the Federal Rules of Criminal Procedure, Defendant had ten peremptory challenges of prospective jurors and two peremptory challenges of prospective alternate jurors. The Government was allowed six peremptory challenges of prospective jurors and two peremptory

3

At 7:20 p.m., the Government objected to Defendant's alleged violation of the principle outlined by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79 (1986), through his use of all of his ten peremptory challenges to remove ten white males from the jury and both of his peremptory challenges to excuse two white male alternate jurors. I directed Defendant to articulate his racially neutral reasons for his peremptory challenges and allowed the Government to rebut Defendant's explanation. At 7:48 p.m., Defendant raised his Batson challenge to the Government's strikes. I allowed the Government to articulate its reasons for its peremptory challenges and, after a brief recess, made my findings relative to the objections at 8:20 p.m. After I placed the four illegitimately-stricken white male jurors back on the jury,[11] the twelve jurors and four alternates were administered their oaths and then left the courthouse by 9:00 p.m.

---

challenges of prospective alternate jurors. Because the Government only peremptorily challenged five prospective jurors and one alternate prospective juror, I excused the last prospective juror (no. 127, a white female) on the strike sheet and the last prospective alternate juror (no. 32, a black female) on the strike sheet before seating the jury.

[11] The four white male jurors were placed back in the positions that they had previously occupied and the last four jurors that had made it onto the jury were excused: no. 172, white male; no. 2, white female; no. 120, African-American female; and no. 138, African-American female. Thus, the final composition of the jury is as follows: five white males, four white females, one black male, and two black females.

## II. Explanation of Batson's Principles

In Batson, the United States Supreme Court held that a prosecutor's use of peremptory strikes in even a single case to remove jurors on account of their race violates the Equal Protection Clause of the United States Constitution.[12] See Batson, 476 U.S. at 87 ("[B]y denying a person participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror."). "Since Batson, the [Supreme] Court has reaffirmed the central meaning of Batson in holding that while '[a]n individual juror does not have a right to sit on any particular petit jury, . . . he or she does possess the right not to be excluded from one on account of race.'"[13] United

---

[12] Soon after the Supreme Court decided Batson, the Eleventh Circuit held that a defendant may not seek Batson relief on the basis of exclusion of jurors based on both race and gender. United States v. Dennis, 804 F.2d 1208, 1210 (11th Cir. 1986)("It would therefore be inappropriate for us to narrow the 'cognizable racial group,' for present purposes, to include only black males and exclude black females"). Since Dennis, the Supreme Court has extended the reasoning in Batson to also protect jurors against gender discrimination. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 145 (1994)("Failing to provide jurors the same protection against gender discrimination as race discrimination could frustrate the purpose of Batson itself. Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination."). The reasoning of Dennis suggests that its holding was "significantly influenced by the fact that gender had not yet been recognized as a discrete classification." See Commonwealth v. Jordan, 785 N.E.2d 368, 378 n.12 (Mass. 2003). Thus, while neither the Supreme Court nor the Eleventh Circuit have addressed whether Batson and J.E.B. protect groups defined by both gender and race, it appears that the Supreme Court's case law on the matter supports the recognition of the white male jurors in this case as a protected class. However, as the body of this opinion demonstrates, I do not rely upon this recognition of white males as a cognizable group to reach my conclusion that Defendant used his strikes in an impermissible manner.

[13] As this statement indicates, it is the potential juror's — not the defendant's — constitutional rights that Batson protects. Prior to Batson, it had been long established that the "Equal Protection Clause

5

States v. Allen-Brown, 243 F.3d 1293, 1297 (11th Cir. 2001)(quoting Powers v. Ohio, 499 U.S. 400, 409 (1991)).

This principle was extended by the Supreme Court to defense peremptory strikes in Georgia v. McCollum, 505 U.S. 42 (1992). The Supreme Court reasoned that "[j]ust as public confidence in criminal justice is undermined by a conviction in a trial where racial discrimination has occurred in jury selection, so is public confidence undermined where a defendant, assisted by racially discriminatory peremptory strikes, obtains an acquittal."[14] Id. at 50. Relying on McCollum, the Eleventh Circuit has stated that a "defendant's misuse of the power of the court to deny a citizen her right to participate on a jury because of race is as reprehensible as a prosecutor's." United States v. Stewart, 65 F.3d 918, 923 (11th Cir. 1995); see also United States v. Allen-Brown, 243 F.3d 1293 (11th Cir. 2001)(applying Batson to a African-American defendant's use of peremptory challenges against white jurors).

---

guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, . . . [but that] a defendant has no right to a 'petit jury composed in whole or in part of persons of his own race.'" Batson, 476 U.S. at 86 (quoting Strauder v. West Virginia, 100 U.S. 303, 305 (1880)).

[14] "As a preliminary matter, it is important to recall that peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial. This Court repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." McCollum, 505 U.S. at 57.

6

In addition to holding that parties may not use peremptory challenges to discriminate against jurors based on their race, the Batson Court explained how to determine whether racial discrimination has occurred in jury selection. Batson, 476 U.S. 96-98. The procedure for evaluating a Batson objection to a peremptory challenge is as follows:

> (1) the objector must make a prima facie showing that the peremptory challenge is exercised on the basis of race; (2) the burden then shifts to the challenger to articulate a race-neutral explanation for striking the jurors in question; and (3) the trial court must determine whether the objector has carried its burden of proving purposeful discrimination.[15]

United States v. Allen-Brown, 243 F.3d 1293, 1297 (11th Cir. 2001). With these principles from Batson and its progeny in mind, I now explain how I applied them to this case.

### III. Application of Batson to the Instant Case

#### A. Defendant's Prima Facie Showing of a Batson Violation

As noted above, Defendant objected to the Government's use of its peremptory challenges to strike four African-American women and one Indian male from the jury in addition

---

[15] When the Eleventh Circuit reviews the resolution of a Batson challenge, it gives "great deference to the district court's finding as to the existence of a prima facie case. Once past the prima facie case step, the district court's determination concerning the actual motivation behind each challenged strike amounts to pure factfinding, and for that reason [the Eleventh Circuit] will reverse the district court's determination only if it is clearly erroneous." United States v. Stewart, 65 F.3d 918, 923 (11th Cir. 1995)(citations omitted).

7

to one African-American female alternate juror. In reaching my conclusion that Defendant had not made a prima facie showing that the Government had violated <u>Batson</u>, I relied, in part, upon the fact that the Government did not use all of its peremptory challenges even though there were five more African-Americans who remained on the jury. While it is true that a party can violate <u>Batson</u> without using all of its peremptory challenges, the Eleventh Circuit has repeatedly explained that "the unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race."[16] <u>Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co.</u>, 236 F.3d 629, 638 (11th Cir. 2000)(collecting cases). After viewing the "totality of the circumstances," <u>Allen-Brown</u>, 243 F.3d at 1298, I found that Defendant failed to establish a prima facie case of a <u>Batson</u> violation and thus I did not need to address

---

[16] The Eleventh Circuit concluded that the defendants in <u>Lowder Realty</u> had not met their burden of establishing a prima facie case that the plaintiffs violated <u>Batson</u> when they struck two white jurors because the plaintiffs had only used two of the three peremptory strikes they were allotted and "not all, nearly all, or even <u>most</u> whites on the panel were struck by plaintiffs." <u>Id.</u> at 637 (emphasis in original). The Government in the instant case used its peremptory challenges to remove four of the nine African-Americans; "not . . . even <u>most</u>" of the African-Americans on the panel. Even if the Indian man who the Government struck is grouped with the African-Americans on the panel, the Government would not have struck most of the racial minorities on the jury.

his objection further.[17]

**B. Government's Prima Facie Showing of a Batson Violation**

In contrast, the Government did establish a prima facie case that Defendant violated Batson by striking white males from the jury. As noted above, Defendant used all ten of his peremptory challenges to remove fifty-six percent of the white potential jurors who made up sixty-four percent of the panel.[18] If Defendant had exercised his ten peremptory challenges in a completely random manner, there was a 0.33% chance that the strikes would have been exercised against ten white jurors. See Lowder Realty Co., 236 F.3d at 637 n.1 (explaining how to calculate probability of striking white jurors). In addition to the inference of discrimination created by this

---

[17] While "a district court may not require an explanation for a peremptory strike unless and until it satisfies itself that a prima facie case has been established," Lowder Realty Co., 236 F.3d at 636 (emphasis added), I allowed the Government to articulate its racially neutral reasons for striking these jurors because it was ready and willing to do so. The Government noted that the first juror that it struck had stated that she could not be impartial and also had a hardship. The second juror struck knew two defense witnesses. The third juror struck knew Defendant Walker's son who is a defense witness. She also stated that she could not be impartial. The fourth juror struck is a doorkeeper for the Georgia legislature and had stated during individual voir dire that she admired Defendant Walker. The fifth juror struck knew a defense witness. The only alternate juror struck by the Government also knew a defense witness. The Government closed its articulation by claiming that it had struck every juror who knew a defense witness. While such a conclusion is not necessary because I found that Defendant had not shown a prima facie Batson violation, I note that the Government's articulated reasons would have been highly persuasive during the third step of a Batson analysis.

[18] Defendant also used both of his two alternate juror peremptory challenges to remove a third of the white potential alternate jurors. Turning to the question of gender discrimination, Defendant also struck most of the males on the jury when he removed ten of the fourteen men on the panel. The combination of the categories of race and gender reveals that Defendant struck eighty-three percent of white males on the jury. See note 12, supra.

9

statistically improbable application of strikes, the "totality of the circumstances"[19] compelled me to act because I had "a reasonable suspicion that Constitutional rights [were] being violated in [my] presence." Allen-Brown, 243 F.3d at 1298.

## C. Defendant's Articulation of Race-Neutral Reasons

Once the Government carried its burden of establishing a prima facie case, the Court directed Defendant to articulate his race neutral reasons for striking the ten white men.[20] Proceeding in the order in which the peremptory challenges were exercised, Defendant stated that he struck Juror Number 160 because he is an accountant and Defendant's defense strategy involved attacking accounting principles. Defendant claims that he removed Juror Number 24 because he was evasive under individual voir dire and because he had previously served on a grand jury. Juror Number 30 was struck because he has an accounting degree and also because he allegedly lied

---

[19] In addition to the number of jurors of a particular category struck, the Eleventh Circuit has identified the following "relevant circumstances" for district courts to consider when evaluating a prima facie case: (1) a "pattern" of strikes against venire members of one race, (2) questions or statements during voir dire or in exercising challenges that suggest a discriminatory purpose, (3) the racial composition of the pool of remaining potential jurors, (4) the race of the defendant, and (5) the nature of the crime charged. Allen-Brown, 243 F.3d at 1297-98. Defendant's use of all of his peremptory challenges to strike white males certainly qualifies as a pattern.

[20] Defendant struck potential alternate Juror Number 17 because he is a member of Sons of Confederate Veterans and opposed the Georgia legislature's decision to re-design the state flag. Defendant removed Juror Number 116 from the pool of potential alternate jurors because he is a lawyer and had been a criminal investigator while serving in the military.

10

when he stated that he reads a newspaper that has had a lot of coverage on this case yet claimed that he did not know anything about the case. Defendant removed Juror Number 137 because he knew a government investigator, listens to a conservative radio talk show host, knew about the case, and is a member of a yacht club.

Defendant used his fifth peremptory challenge against Juror Number 98 because he listens to Christian gospel music and Fox News. Juror Number 93 was removed because he listens to Christian radio and works for the Department of Defense. Defendant struck Juror Number 69 because of his "body language" during voir dire and because he watches Fox News. Juror Number 97 was struck because he reads the Drudge Report and listens to "ultra-conservative" radio personalities such as Rush Limbaugh. Defendant struck Juror Number 159 because he had previously served on the city council of a small town and Defendant was worried that this juror would try to extrapolate "small town" politics to state politics. Defendant used his last peremptory challenge to strike Juror Number 56 because he supervises employees.

**D. Government's Showing of Purposeful Discrimination**

After Defendant stated his reasons for striking these potential jurors, the Court permitted the Government to present evidence to rebut Defendant's articulated reasons.

Based on the strength of its rebuttal evidence, the Government carried its burden of showing that Defendant purposefully discriminated against Juror Number 160, Juror Number 69, Juror Number 159, and Juror Number 56 on account of their race. For example, the Government demonstrated that Defendant's articulated reasons for striking Juror Number 160 and Juror Number 56 were pretextual by pointing out that Defendant did not strike Juror Number 54 (a white female) who has both of the characteristics (accounting skills and supervisory job) that Defendant relied upon to justify striking Juror Number 160 and Juror Number 56. Furthermore, the Government adequately demonstrated that the fact that Juror Number 159 had previously served on the city council of a small town was not the real reason that Defendant removed this juror from the jury.

Turning to the reason given for striking Juror Number 69, Defendant did not explain what troubled him about this juror's "body language." "[W]here the proffered race-neutral explanation centered on the juror's 'body language' and 'mannerisms' . . . , behaviors that are especially given to on-the-spot interpretation," United States v. Cordoba-Mosquera, 212 F.3d 1194, 1198 (11th Cir. 2000), the Court is in as good a position as Defendant to compare the stricken juror's behavior during voir dire to other jurors' mannerisms.

Based on my observations that Juror Number 69 did not exhibit any negative "body language" and Defendant's failure to elaborate what bothered him about this juror's "body language," I concluded that Defendant offered more rationalization than reason when he explained why he removed Juror Number 69 from the jury.

### E. Remedy for Defendant's Batson Violation

After determining that four jurors had been impermissibly struck, I asked the parties for advice on how to craft a remedy for this constitutional violation.[21] While Defendant argued that he should regain the four peremptory challenges that he had improperly exercised, the Government correctly noted that Defendant had previously consented to the dismissal of the remaining potential jurors who had been patiently waiting in the hallway and that no additional jurors remained in the courthouse which Defendant could strike. After considering all of the available options, I reinstated Juror Number 160, Juror Number 69, Juror Number 159, and Juror Number 56 on the jury.

While the Supreme Court has not decided how a Batson

---

[21] "In fashioning a remedy for any constitutional violation, a court ought to take as its touchstone the basic proposition that the nature of the remedy must be determined by the nature and the scope of the constitutional violation. It is also necessary to take into account the practicalities of the situation." Koo v. McBride, 124 F.3d 869, 873 (7th Cir. 1997)(discussing remedy for a Batson violation and citing Milliken v. Bradley, 433 U.S. 267, 280 (1977)).

13

violation should be remedied,[22] the Eleventh Circuit has upheld the re-seating of an illegitimately-stricken juror as a remedy for a Batson violation. See Central Alabama Fair Housing Center, Inc. v. Lowder Realty Co., 236 F.3d 629, 632 (11th Cir. 2000); United States v. Stewart, 65 F.3d 918, 922-23 (11th Cir. 1995). In a case where an African-American defendant exhibited group bias in exercising his peremptory challenges to exclude white male prospective jurors, the California Supreme Court noted that "situations can arise in which the remedy of mistrial and dismissal of the venire accomplish nothing more than to reward improper voir dire challenges and postpone trial."[23] People v. Willis, 43 P.3d 130, 137 (Cal. 2002). Based on the nature of Defendant's

---

[22] The Batson Court stated in a footnote that "[i]n light of the variety of jury selection practices followed in our state and federal trial courts . . . , we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire." Batson, 476 U.S. at 99 n.24 (citations omitted).

[23] The California Supreme Court explained further that the Willis case "vividly demonstrates the need for the availability of some discretionary remedy short of dismissal of the remaining jury venire. Here, defendant, through counsel, originally sought that very remedy as a ready means of curing a perceived imbalance in the initial jury venire. Failing to achieve that end through appropriate proof, the defense then engaged in a series of concededly improper and biased peremptory exclusions, aimed at indirectly accomplishing what it could not directly achieve, thereby violating the People's right to a representative and impartial jury. To remedy that improper course of conduct by dismissing the remaining venire not only would reward such conduct and encourage similar conduct in future cases, but also would frustrate the court's substantial and legitimate interest in the expeditious processing of cases for trial." Willis, 43 P.3d at 135.

14

Batson violations, the dismissal of the venire in this case would have been an ephemeral remedy. Therefore, the reseating of the stricken jurors was the only adequate available remedy.

## IV. Conclusion

Even though I made my oral ruling on this matter at 8:20 p.m. after a long day of jury selection and, as I noted to the parties on the morning of Tuesday, May 24, 2005, I may not have been as articulate in my statements on this issue as I would have liked to have been, I am as confident now as I was then that a constitutional violation occurred during jury selection, the appropriate remedy was administered, and an impartial jury was impaneled.

**ORDER ENTERED** at Augusta, Georgia, this 31st day of May, 2005.

_____
UNITED STATES DISTRICT JUDGE

# United States District Court
## Southern District of Georgia

UNITED STATES OF AMERICA     *

vs.     *     CASE NO. CR104-59

CHARLES W. WALKER, et al.     *

    *

    *

The undersigned, a regularly appointed and qualified deputy in the office of this Clerk of this District, while conducting the business of the Court for said Division does hereby certify the following:

1. Pursuant to instructions from the court, and in the performance of my official duties, I personally placed in the U.S. Mail a sealed envelope bearing the lawful frank of the Court, and properly addressed to each of the persons, parties or attorneys listed below; and

2. That the aforementioned envelope(s) contain a copy of the documents known as Order dated 5/31/05, which is part of the official records of this case.

Date of Mailing: 5/31/05
Date of Certificate: 5/31/05

SCOTT L. POFF, CLERK

By _L. Jlastu_

NAME:
1. Charles W. Walker, Sr., Edward Garland, Thomas W. Tucker (hand delivery)
2. Donald F. Samuel (hand delivery)
3. Jerome J. Froelich, Jr. (hand delivery)
4. James B. Ellington
5. Thomas M. Clyde
6. 
7. 

Cert/Copy
- ☐ ☒ District Judge
- ☐ ☐ Magistrate Judge
- ☐ ☐ Minutes
- ☐ ☐ U.S. Probation
- ☐ ☐ U.S. Marshal
- ☐ ☒ U.S. Attorney
- ☐ ☐ JAG Office

Cert/Copy
- ☐ ☐ Dept. of Justice
- ☐ ☐ Dept. of Public Safety
- ☐ ☐ Voter Registrar
- ☐ ☐ U.S. Court of Appeals
- ☐ ☐ Nicole/Debbie
- ☐ ☐ Ray Stalvey
- ☐ ☐ Cindy Reynolds